******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE JAMES O., JR., ET AL.*
(SC 19579)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.**

*Argued May 5—officially released August 12, 2016****

*David J. Reich*, for the appellant (respondent
mother).

*Frank H. LaMonaca*, assistant attorney general, with
whom, on the brief, were *George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, *Benjamin
Zivyon*, assistant attorney general, and *Romiesha
Briscoe*, certified legal intern, for the appellee (petitioner).

*Opinion*

ROGERS, C. J. The sole issue in this certified appeal is whether the trial court made an improper comparison between the respondent mother, Marjorie H., and Paula M., the therapeutic foster mother of the respondent's minor children, James O., Jr., and Jolene O., during the adjudicative phase of its judgment terminating the respondent's parental rights.[1] The respondent[2] appeals from the judgment of the Appellate Court affirming the trial court's decision to terminate her parental rights as to James and Jolene, and to appoint the petitioner, the Commissioner of Children and Families, as their statutory parent. *In re James O.*, 160 Conn. App. 506, 508, 127 A.3d 375 (2015). The respondent claims that the Appellate Court improperly affirmed the trial court's judgment terminating her parental rights pursuant to General Statutes (Rev. to 2013) § 17a-112 (j) (3) (B)[3] because the trial court engaged in an improper comparison between the parenting abilities of the respondent and those of Paula M. to support the court's conclusion that the respondent had failed to reach a sufficient level of personal rehabilitation. We disagree and affirm the judgment of the Appellate Court.

The following facts, which the trial court found by clear and convincing evidence, and procedural history are relevant to the resolution of this appeal. During the spring of 2011, staff at James' school became concerned with the fact that James, then seven years old, was making suicidal and homicidal statements and was physically harming himself. The school staff attempted to work with the respondent to secure a psychological evaluation and appropriate treatment for James.

Around the same time, James' therapist reported that James disclosed to her that he "had a secret, that he [heard] voices, and that he hurts himself at home." The therapist also recommended that James receive a psychological evaluation, but the respondent refused to allow an evaluation unless the school paid for both children to be evaluated. The therapist did not believe that the respondent grasped the seriousness of James' condition.

School staff also referred James for Intensive In-Home Child and Adolescent Services (in-home services). The respondent refused to allow the services in her home. The respondent removed the children from the school, intending to homeschool them, claiming that James had psychotic episodes only at school and would behave normally at home. During 2011, the children's school made a referral for both children to the Department of Children and Families (department).

On June 9, 2011, the petitioner filed neglect petitions and sought and received an order of temporary custody as to both children based on the children's exposure to substance abuse and domestic violence, evidence of

James' serious mental health issues, the failure of both parents; see footnote 2 of this opinion; to follow through with recommended services for both children, and the withdrawal of the children from school and the resulting lack of visibility in the community. The petitioner included as an additional ground educational neglect arising from the children having missed thirty days of school.

At the time of their removal from the respondent's custody, both children displayed highly disturbing behaviors. After removal, outside the presence of his parents, James disclosed to Danbury Hospital staff that he was hearing voices and that his head was telling him to do things. James threatened to harm another child in his first foster home, stating that he would kill and eat the child. Jolene, then six years old, displayed sexualized behavior including frequent public masturbation, talk about sex, and attempts to engage other children, including her brother, in inappropriate sexual acts. Based on Jolene's conduct, her first foster mother questioned whether Jolene had a history of sexual abuse.

Despite Jolene's behavior, the respondent and the department reached an agreement whereby the order of temporary custody would remain in effect for James, who was to be hospitalized at Yale-New Haven Hospital for psychiatric treatment, while the order would dissolve for Jolene on June 23, 2011, upon the condition that the respondent would take Jolene to therapy. On June 24, 2011, during her therapy in-take interview, Jolene disclosed to the therapist that her father had physically abused her and inappropriately touched her. The department invoked a ninety-six hour hold and removed Jolene from the respondent's custody for the second time.

While at Yale-New Haven Hospital, James continued to make suicidal statements and homicidal statements about killing and eating other children. The respondent attributed his conduct to a cartoon he watched on television. The hospital staff also reported bizarre interactions between James and Jolene. They observed that the parents did not set appropriate limits on the children's behavior.

The department placed James and Jolene in a Safe Home placement, which would provide more stability, allow the children to receive mental health services directly at the facility, and allow the department to more directly assess their needs. While the children were at the Safe Home, the department determined that the children would need a family that would understand and be able to handle their ongoing behavioral issues. James was still having suicidal ideation, had a tendency to fixate, and had a fragile emotional state. In addition to sexual behavior, Jolene was reluctant to bathe, was very hyperactive and aggressive, cursed and made threats to others. She also exhibited excessive animal

behaviors, at times walking on all fours and making animal noises, and had a skewed sense of reality. Safe Home staff described her "as one of the most traumatized children they have seen."

The department determined that the children needed to be placed in a therapeutic foster home with a caregiver who could understand and manage their behaviors and provide more intensive therapeutic support. In October, 2011, the department placed the children with Paula M., a licensed therapeutic foster care provider. The trial court described Paula M. as "part of a team that includes [the department], the children's therapists, and Wheeler Clinic . . . ." Paula M. met with the children's therapists weekly, attended special education planning and placement meetings, informed the children's therapists of issues that arose with the children, and helped to implement at home what the children learned in therapy, such as specific coping skills when they became anxious. Paula M. also worked with the in-home service providers in the home twice weekly, once with James and a second time without the children present to train her to work with James.

Beginning in October, 2011, Jolene was referred for treatment to the Child Abuse Treatment Services Program at Klingberg Family Centers. That program uses trauma focused cognitive behavioral therapy to assist children who have experienced physical or sexual abuse or have witnessed domestic violence. At the time of the referral, the therapists were not able to begin trauma focused cognitive behavioral therapy with Jolene because the respondent refused to give her consent.

In February, 2012, both children separately made disclosures of sexual abuse to Paula M. Using the coping skills he learned in therapy, James wrote a narrative that included numerous explicit descriptions of a variety of sexual contact involving James, Jolene, and their parents. While attending church with Paula M., Jolene asked for paper and a pencil and then drew figures of what looked like a child and an adult, including one that suggested sexual activity between the two figures. Paula M., in her capacity as a mandatory reporter, provided a copy of Jolene's drawings to the department. Jolene subsequently disclosed to her therapist that the drawings depicted her abuse.

On June 19, 2012, after the trial court had already taken evidence in the contested neglect petitions over several days, the respondent and the children's father entered nolo contendere pleas to neglect. The court adjudicated the children neglected and committed them to the custody of the petitioner.

Because of Jolene's commitment to the petitioner's custody, she was able to begin trauma focused cognitive behavioral therapy. The goal of her therapy was treat-

ment of the symptoms of trauma and abuse, rather than investigation of alleged sexual abuse. Jolene was diagnosed with post-traumatic stress disorder (PTSD). By June, 2013, Jolene exhibited a successful reduction in trauma symptoms, developed coping and relaxation skills, and, as a result, was successfully discharged from the trauma focused cognitive behavioral therapy program.

James also exhibited a marked improvement to his therapists. At the time of his initial commitment, James presented with suicidal ideation, hypervigilance, high anxiety, frequent tantrums, a great deal of fear, difficulty sleeping, and paranoia. He was diagnosed with PTSD and autism. By the time his most recent therapist was assigned to him in June, 2013, he was no longer presenting with suicidal ideations and his anxiety had decreased significantly. James continued to exhibit issues with boundaries and social skills, which caused behavioral issues for him at school. James' therapist noted that he required the lessons and skills he was taught in therapy to be mirrored in the parenting he received at home, with a caregiver who is firm, but also very calm, warm, and supportive of him.

At the time that the respondent entered her nolo contendere pleas to neglect, the respondent agreed to specific steps to facilitate reunification with James and Jolene, including attending individual therapy for the purpose of gaining insight into domestic violence and its impact on the children, improving her communication skills, learning how to problem solve without escalating to violence, and understanding appropriate boundaries with respect to sexual abuse and the needs of children who have disclosed sexual abuse.

The respondent declined to see a department recommended therapist and instead selected one who disagreed with most of the treatment goals outlined in the court-ordered specific steps. Rather than work with the respondent to address the steps provided by the court, the psychologist focused, instead, on discrediting the children's reports of sexual abuse. The trial court found that while the respondent attended individual therapy, she failed to advance any of the goals of such therapy as agreed to in her specific steps.

During the children's commitment, the department provided the respondent with supervised visitation with the children and parent education support, as well as assistance with transportation to visitations. The respondent worked with two parent educators along with visitation supervisors. Both parent educators attempted to provide feedback to the respondent on her interactions with the children, but the respondent reacted negatively to any perceived criticism, at times yelling at the educators or the department social worker. The parent educators observed that the respondent continued to have difficulty setting appropriate

limits for the children or setting consequences if the children failed to comply with limits.

As part of her specific steps, the respondent was also required to improve her communication skills in order to allow her to effectively communicate and work with the children's therapy providers. The respondent was permitted, and encouraged, to communicate with the children's therapists and school social workers and psychologists. The respondent declined to do so.

The respondent was also required to take steps to acknowledge her role in the removal of her children. The respondent focused, instead, on denying the allegations of sexual abuse. She also failed to acknowledge the disturbing behavior that initially led to her children's removal or the impact of substance abuse and domestic violence on the children. While she acknowledged that the children's father had a substance abuse issue and could be violent, she minimized the impact that his behavior had on the children and did not acknowledge her own propensity for violence. According to the respondent, the father's substance abuse and violence would not impact the children in the future because she was then divorced from the father and he did not have visitation rights under the dissolution agreement. The trial court found, however, that the respondent and the father entered into a visitation agreement in order for it to appear to the department that the respondent was protecting the children when, in reality, the respondent and the father still had a relationship and he was often present in her home.

On April 24, 2013, the petitioner, pursuant to § 17a-112 (j) (3) (B), filed a petition to terminate the respondent's parental rights as to both children on the ground that she had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and particular needs of the children, she could assume a responsible position in their lives.

On November 13, 2014, the trial court terminated the respondent's parental rights as to both children. The court found that the department had made reasonable efforts to reunify the respondent with both children, but that she failed to acknowledge the children's disturbing behavior and her role in causing their removal. The court further found that the respondent had failed to achieve a reasonable level of rehabilitation. The court finally found that it was in the best interest of the children for the court to terminate the respondent's parental rights.

On March 3, 2015, the respondent appealed the trial court's termination of her parental rights to the Appellate Court, claiming that the court had made an improper comparison between the respondent and Paula M. in the adjudicative portion of its memorandum

of decision.[4] Thereafter, the Appellate Court affirmed the judgment of the trial court. *In re James O.*, supra, 160 Conn. App. 507, 528. The Appellate Court "construe[d] the language relied on by the respondent, not as making a direct comparison between the respondent and Paula M., so much as clarifying that the children needed and continued to need an environment that is calm, in which their needs are understood, and in which their caregiver can manage their anxiety in an appropriate manner." Id., 520. This appeal followed.

The respondent claims that the Appellate Court improperly held that the trial court did not engage in an improper comparison between the parenting abilities of the respondent and Paula M. in the adjudicative portion of its memorandum of decision terminating the respondent's parental rights. In the respondent's view, certain language in the trial court's memorandum of decision evidences its improper reasoning. The respondent contends that any comparison at all between a parent and a foster parent is a violation of Practice Book § 35a-7 (b),[5] should be presumed to influence the trial court's determination in the adjudicatory phase, and requires reversal.[6]

The petitioner agrees that if the trial court based its determination that the respondent had failed to reach an adequate level of rehabilitation on a finding that Paula M. was a better parent or was a preferable parent to the respondent, that would be a due process violation and grounds for reversal. The petitioner contends that, when read within the context of the entire memorandum of decision, the challenged language does not constitute a comparison between the respondent and Paula M. Rather, the court was discussing the specific needs of the children as a predicate to considering the respondent's ability to meet those needs. Within this context, the examination of Paula M.'s role in the children's therapy and the environment of the foster home are merely evidence of what is actually required to meet the children's specific needs, which is a necessary consideration during the adjudicative phase of a termination of parental rights determination when the ground for termination is a failure to rehabilitate. The petitioner further emphasizes that the respondent failed to reach even a minimally sufficient ability to assume a role as an appropriate caregiver and refused to even acknowledge the children's particular needs. Therefore, according to the petitioner, the court did not make an improper comparison that would require reversal. We agree with the petitioner.

We first set forth the applicable standard of review and general principles. "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the inten-

tion of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations that the court provides."[7] (Citations omitted; internal quotation marks omitted.) *Olson* v. *Mohammadu*, 310 Conn. 665, 682, 81 A.3d 215 (2013).

"In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 148–49, 962 A.2d 81 (2009), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 746–47, 754, 91 A.3d 862 (2014). When the petitioner seeks to terminate a parent's parental rights on the ground that the parent has failed to rehabilitate, "[t]he trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status *as it relates to the needs of the particular child*, and further . . . such rehabilitation must be foreseeable within a reasonable time." (Emphasis added; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585, 122 A.3d 1247 (2015). Therefore, the trial court must first determine the needs of the particular child before determining whether a parent has achieved a sufficient rehabilitative status to meet those needs. See, e.g., *In re Shyliesh H.*, 56 Conn. App. 167, 175, 743 A.2d 165 (1999) (respondent's rehabilitative status viewed in light of child's medical and psychiatric conditions).

Turning to the ability of a trial court to consider evidence of the abilities of a foster parent when adjudicating a petition to terminate parental rights, we have recognized that such determinations "are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria."[8] *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672–73, 420 A.2d 875 (1979). " 'It is . . . essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable. Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a two-step process to determine, first, the threshold question of whether cause for termination . . . has been proved.' [Id., 673];

see also *Matter of Corey L* v. *Martin L*, 45 N.Y.2d 383, 391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978). Accordingly, we have held that '[o]nly if a ground for termination exists may the suitability and circumstances of adoptive parents, in an appropriate proceeding, be considered.' *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 645, 436 A.2d 290 (1980)." *In re Baby Girl B.*, 224 Conn. 263, 275, 618 A.2d 1 (1992).

We do not permit foster or preadoptive parents to intervene in termination proceedings because to do so would "permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings." (Internal quotation marks omitted.) Id., 278. We have never held, however, that a foster parent may not testify during the adjudicative phase of a termination proceeding or that a trial court may not consider evidence that arises within the context of a foster placement that is relevant to one of the statutory grounds raised for termination of parental rights. See *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 266–67, 449 A.2d 165 (1982) (*Shea, J.*, dissenting) ("Unquestionably the foster parents . . . would have been permitted to testify, as the foster mother did, during the adjudicative phase of the termination proceedings. The majority opinion does not question that her testimony was highly relevant to the grounds alleged for termination of parental rights."); see also *In re Anthony H.*, 104 Conn. App. 744, 752, 936 A.2d 638 (2007) (trial court noted, and Appellate Court did not question, that child needed "a substantial amount of structure, which his prior therapeutic foster homes were able to provide" within context of specific needs of child), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008); *In re Vincent D.*, 65 Conn. App. 658, 665–66, 783 A.2d 534 (2001) (foster parent may not intervene in adjudicative phase of proceeding, but may be called as witness for petitioner on issues that may be considered during dispositional phase); *In re Shyliesh H.*, supra, 56 Conn. App. 171–72 (child's interactions with foster mother, in contrast to interactions with others, were evidence of psychiatric condition relevant to specific needs of child in adjudicative phase).

We must determine, therefore, whether the trial court properly considered evidence of the children's foster placement as relevant to an aspect of an adjudicatory ground for termination, or rather, as the respondent contends, it improperly reasoned that termination was warranted because Paula M. was a better or preferable parent than the respondent. Looking to the trial court's memorandum of decision, the court made the following findings that are relevant to this determination.

At the outset of its analysis on the respondent's failure to rehabilitate, the trial court quoted law stating that rehabilitation must be assessed with reference to the needs of the particular children at issue. Thereafter,

the court emphasized that "[p]ivotal to this court's findings and the starting point for its analysis is the . . . determination of the age and needs of James . . . and Jolene." The court went on to describe the children's history of disturbing behavior, the respondent's continuing failure to acknowledge that behavior, and her role in causing it, opining that such failure was an "enormous impediment to reunification."[9]

The trial court next noted that "[t]he most credible, persuasive and reliable evidence of the children's needs is the testimony of the children's therapists, as manifested by the therapeutic approach they utilized and the importance of the caregivers' role in helping the children address and heal from the trauma they have endured." The court went on to describe the goals of the children's therapy and the roles of various therapy providers, including Paula M., in documenting any disclosures made by the children.

The next paragraph of the memorandum of decision is the subject of this appeal. In its entirety, it reads: "More important than the disclosures, however, is the clear and convincing evidence that the children have made extraordinary progress while living with Paula M., in an environment that is calm and understanding of the children's needs. As both therapists have made clear, the children have needed a caregiver who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety. The children have also needed someone who would believe their statements about the source of their trauma. [The children's therapist] credibly testified that the [trauma focused cognitive behavioral therapy] model requires that a child be understood and treated in the context of their living environment. As the children's progress, relationship and work with Paula M. makes clear, the process of healing and recovery must also occur in a home environment which the children have come to learn is safe and caring. Given Paula M.'s training and participation in therapy sessions, it is clear that this process cannot be limited to the one hour per week session that a child has, even with a trusting therapist. In contrast, [the respondent] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and, therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma. In short, [the respondent] has none of the qualities [that] the children have required to stabilize and to continue to heal from the traumas they experienced while in their parents' care."

In the very next paragraph, the trial court reiterates that "the most credible and reliable evidence of the age and needs of the children, around which the [respondent's] rehabilitation is evaluated and assessed, neces-

sarily comes from the work done by the children's therapeutic team, which includes the work of [Paula M.], the reliable and credible evidence regarding the children's severely disturbed behaviors and the degree to which the children's behaviors have greatly stabilized. The evidence that the children have, in fact, made such dramatic improvement in their functioning, under the conditions which their therapists and caregivers have been able to dictate and nurture, is itself confirmation of the expertise, skill and knowledge of these professionals." Thereafter, the trial court concluded the adjudicatory phase, finding "that the petitioner has met its burden, by clear and convincing evidence, [that] the [respondent has] failed to rehabilitate, given the age and needs of both children."

After considering the challenged portion of the memorandum of decision within the context of the trial court's overall analysis, we conclude that the court's adjudicative findings are appropriately centered on the specific needs of James and Jolene, a necessary consideration when determining whether a respondent has failed to rehabilitate. The beginning of the court's analysis makes it abundantly clear that the court is focused on James' and Jolene's particular needs, as seriously traumatized children, and is assessing the respondent's state of rehabilitation with reference to those needs. Additionally, the court twice indicates its belief that the best evidence of those needs is an examination of the children's course of therapy and its positive results, including the roles of their therapists and caregivers. In essence, the court recognized that, whoever the children's caregiver is, he or she necessarily must play an important role in helping the children continue to address and heal from their trauma.

It is within this overall framework that the trial court made the findings that the respondent alleges are an improper comparison of the respondent and Paula M. Here, while the court does specifically discuss Paula M., it does so in light of what the children's therapists have testified are the specific needs of the children. The court notes generally that, "[a]s both therapists have made clear, the children have needed *a caregiver* who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety. The children have also needed someone who would believe their statements about the source of their trauma." (Emphasis added.) The court is basing the level of care needed not on what Paula M. is providing to the children, but on what the children's therapists have testified the children need from *a caregiver*. Although the court then discusses the progress made by the children while they were living with Paula M., we interpret that discussion as merely evidence that supports the recommendations of the children's therapists as to the children's particular needs. In short,

the improvements seen from Paula M.'s implementation of the therapeutic recommendations proved the need for and efficacy of the recommended approach. Importantly, the court never opined that only Paula M. could meet the children's needs or that Paula M. ought to be the person to meet their needs. The court merely explained that, when the children were in an environment that did meet their particular needs, they were able to make extraordinary progress.

Appropriately, the trial court then began its assessment of the respondent's ability to meet the particular needs of the children. The respondent advocates that the sentence beginning "[i]n contrast" evidences an improper comparison of the abilities of the respondent and those of Paula M. Reading that sentence in context, however, we disagree. Rather, the language following "[i]n contrast" directly parallels the language the court previously had used to describe generally the qualities of *a caregiver* who would meet the children's particular needs. In establishing the children's particular needs, the court found that "the children have needed a caregiver who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety . . . [and] also . . . someone who would believe their statements about the source of their trauma." Then in evaluating the respondent, the court found that, "[i]n contrast, [the respondent] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and, therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma." It is clear that the contrast drawn by the court is between the qualities of a caregiver who meets the particular needs of the children, as described by the children's therapists, and those of the respondent.

Most importantly, after comparing the needs of the children with the abilities of the respondent, the trial court found that the respondent "has *none* of the qualities the children have required to stabilize and to continue to heal from the traumas they experienced while in their parents' care." (Emphasis added.) Quite simply, the court found that the respondent did not have the minimum ability to meet her children's particular needs and refused to even acknowledge what those needs were. While we are sensitive to the risks of a court comparing the abilities of a natural parent who can meet the basic needs of her children with the abilities of a foster parent who is more capable of meeting those needs and then making an adjudicatory determination based on who can *better* meet the needs of the particular children, those risks do not materialize when a court has found that a respondent has failed to achieve *any* level of rehabilitation and has *none* of the qualities necessary to meet the needs of the particular children.[10]

Therefore, because the trial court found that the respondent had none of the qualities necessary to meet her children's needs, we conclude that the court did not improperly compare the abilities of the respondent and Paula M. in making its finding during the adjudicatory phase that the respondent failed to achieve a reasonable degree of rehabilitation.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, EVELEIGH and ESPINOSA, Js., concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Chief Justice Rogers was not present when the case was argued before the court, she has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

*** August 12, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We granted the respondent's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly determine that the trial court's comparison between the [respondent's] ability to parent and [Paula M.'s] abilities to parent did not improperly factor into the court's determination that the [respondent] had failed to rehabilitate?" *In re James O.*, 319 Conn. 956, 125 A.3d 533 (2015). Because the Appellate Court concluded that the trial court did not make such a comparison, the issue before this court, more accurately rephrased, is whether the trial court made an improper comparison between the respondent and Paula M. during the adjudicatory phase of its decision. See *State* v. *Ouellette*, 295 Conn. 173, 184, 989 A.2d 1048 (2010) (court may reframe certified question to more accurately reflect issue).

[2] The trial court also terminated the parental rights of the children's father, James O., Sr. The respondent father has not appealed from that judgment. We refer to the mother as the respondent in this opinion.

[3] General Statutes (Rev. to 2013) § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition [terminating parental rights] if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . (ii) . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

Section 17a-112 (j) (3) (B) was amended in 2015. See Public Acts 2015, No. 15-159, § 1. For purposes of clarity, we refer to the 2013 revision of the statute, which was in effect at the time of the relevant proceedings.

[4] The respondent also raised two additional grounds for reversal: (1) that the trial court improperly concluded that the petitioner proved by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent and the children; and (2) that the trial court abused its discretion in admitting into evidence two statements made by the children. The Appellate Court affirmed the judgment of the trial court with respect to the first additional ground and declined to review the second ground as it was inadequately briefed. See *In re James O.*, supra, 160 Conn. App. 525, 526. The respondent did not seek certification of these issues to this court.

[5] Practice Book § 35a-7 (b) provides: "In the discretion of the judicial authority, evidence on adjudication and disposition may be heard in a nonbifurcated hearing, provided disposition may not be considered until the adjudicatory phase has concluded."

[6] The respondent also claims that the comparison of the parenting skills of the respondent and Paula M. violated her due process rights and was plain error, both requiring reversal. Because both claims rely on a determination that the trial court improperly compared the respondent and Paula M., and we conclude that no such comparison was made, we do not reach these additional claims.

[7] We note that in the present case, the respondent did not seek an articulation of the trial court's memorandum of decision. In the absence of an articulation, "[w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Internal quotation marks omitted.) *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012). The concurring justices acknowledge that certain of the trial court's findings are susceptible to varying interpretations, yet construe them as undermining the judgment, contrary to this tenet.

[8] We note that, while not all foster parents are proposed adoptive parents, the consideration of the relative merits of a foster parent or an adoptive parent raises similar issues. See *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 261–62, 449 A.2d 165 (1982) (foster parents do not have standing to intervene in proceeding on termination of parental rights of natural parents).

[9] In finding that the department had made reasonable efforts to reunify the respondent and the children, the trial court also emphasized that "both parents have seriously discounted and/or not acknowledged the extent to which domestic violence and substance abuse have been a significant source of trauma to their children. Having focused exclusively on the allegations of sexual abuse, the parents have failed to acknowledge the degree to which their children presented with profoundly disturbing behaviors, which has not been credibly disputed. Despite opportunities to talk to her children's therapists, [the respondent] has refused to do so and thus has actively chosen to ignore her children's problems and how their needs can be addressed."

[10] In light of this circumstance, we disagree with the reasoning of the concurrence that the trial court engaged in an impropriety, albeit a harmless one. In short, because the respondent, considered in isolation, had completely failed to reach the level of rehabilitation necessary to reunite her with her children, there simply was no practical reason for the court to engage in a comparison between her and Paula M., as the respondent was not going to regain custody regardless of their relative merits as parents. Stated otherwise, because the respondent herself clearly had failed to rehabilitate, the court did not, in violation of our jurisprudence, "compare unfavorably the material advantages of the [children's] natural parents with those of prospective adoptive parents and *therefore . . . reach a result based on such comparisons rather than on the statutory criteria*." (Emphasis added.) *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 672–73.