******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE BRIAN P.*
## (AC 43032)

DiPentima, C. J., and Alvord and Moll, Js.

*Syllabus*

The respondent parents appealed from the judgment of the trial court termi-
nating their parental rights with respect to their minor child, B. They
claimed that the trial court improperly concluded that they had failed
to achieve a sufficient degree of personal rehabilitation as required by
the applicable statute (§ 17a-112). They further claimed that the court
failed to determine the needs of B before deciding whether they had
failed to rehabilitate, and improperly found that termination of their
parental rights was in the best interest of B. *Held*:

1. The trial court properly found that the respondent parents had failed to
   achieve sufficient personal rehabilitation so as to encourage the belief
   that they could assume a responsible position in the life of B within a
   reasonable time: although the parents claimed that the court erred in
   terminating their parental rights solely on the basis of their drug use
   and addiction, even though their drug use never caused them to provide
   inadequate care for B and they had stopped using drugs, the court based
   its finding that the parents failed to rehabilitate on multiple factors,
   which this court could not conclude were clearly erroneous, including
   the parents' drug related arrests, their limited engagement in counseling
   and treatment, their lack of financial and housing independence, that
   their progress in addressing their addiction was outweighed by their
   prior pattern of drug use and other instances of bad parental judgment,
   and its determination that the parents were not fully credible because
   their testimony conflicted with testimony presented by the petitioner,
   the Commissioner of Children and Families; furthermore, even though
   the parents claimed that drug use was an insufficient basis to terminate
   parental rights, B was adjudicated neglected after the parents filed pleas
   of nolo contendere to allegations that B was permitted to live under
   conditions injurious to well-being, leaving the court at the adjudicatory
   phase only to determine whether the parents failed to rehabilitate.

2. The respondent parents could not prevail on their claim that the trial
   court failed to determine the needs of B before deciding whether they
   had failed to rehabilitate: the court correctly noted that, under § 17a-
   112, it was required to analyze the parents' rehabilitative status as it
   related to the needs of B, and, thereafter, found that, after considering
   B's need for a secure, permanent placement, the totality of circum-
   stances, and all statutory criteria, and having found by clear and convinc-
   ing evidence that reasonable efforts at reunification with the parents
   were made and that the parents were unwilling to benefit from those
   efforts, that grounds existed to terminate their parental rights for a
   failure to rehabilitate, and that it was in B's best interest to terminate
   those rights, before terminating the parents' parental rights; while it
   may have been clearer for the court to have stated B's needs at the
   outset of the adjudicatory phase of its analysis, the court's findings did
   not suggest that it failed to determine B's needs before concluding that
   the parents failed to rehabilitate, particularly it is undisputed that, at
   times, some of the findings relevant to the analysis in the adjudicatory
   phase will be relevant and overlap with the dispositional phase.

3. The respondent parents' claim that the trial court improperly found that
   termination of their parental rights was in the best interest of B was
   unavailing: the court made required findings under the factors set forth
   in § 17a-112 (k) before determining that termination of the parents'
   parental rights was in the best interest of B; given B's age, the fact that
   B spent more than one-half of his life in foster care, and the court's
   findings as to the parents' failure to rehabilitate, this court could not
   conclude that the court's findings as to B's need for a permanent, safe
   and nurturing home and the parents' inability to meet that need were
   clearly erroneous; moreover, if, as the parents contended, there was no
   evidence that B's needs were not being met, credit belonged to the
   foster mother who was primarily responsible for meeting B's needs, and

the court's finding that B's needs were met by his foster mother was consistent with its findings that B needed stability and that termination of the parents' parental rights was in B's best interest.

Argued December 10, 2019—officially released February 6, 2020**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Driscoll, J.*; judgment terminating the respondents' parental rights, from which the respondents appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, for the appellants (respondents).

*Sara Nadim*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*James W. Auwood*, for the minor child.

*Opinion*

ALVORD, J. As the trial court aptly observed, "[t]his is another sad case involving opiates and their invidious harm to parents' lives and families." The respondents, Jennifer L. (mother) and Brian P. (father), appeal from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating their parental rights with respect to the minor child, Brian P.[1] On appeal, the respondents claim that the court improperly (1) found that they had failed to achieve a sufficient degree of personal rehabilitation, (2) failed to determine the needs of Brian P. before deciding whether they had failed to rehabilitate, and (3) found that termination of their parental rights was in the best interest of Brian P.[2] We affirm the judgment of the trial court.

The following facts, which the court found by clear and convincing evidence, and procedural history, are relevant to this appeal. Brian P. was born to the respondents in February, 2016. The respondents have been in a relationship with one another since 2012, and were engaged to be married at the time of Brian P.'s birth. Prior to Brian P.'s birth, the father, a college graduate with honors, decided against pursuing graduate school to work, instead, full-time at a casino restaurant in New London county. The father's career initially was financially rewarding, enabling the respondents to purchase a home in Rhode Island, two cars, and an engagement ring for the mother. The father's employment also provided him with access to illicit drugs, a feature of what he labelled "the casino lifestyle." (Internal quotation marks omitted.) The father began with what he described as recreational use of opiates, which led to an addiction. The mother also became addicted to opiates. The respondents' addictions caused them to lose their home, a car, and the mother's engagement ring. Together, they moved into the paternal grandmother's home while the father continued to work in casino restaurants. Neither of the respondents sought treatment for their addictions prior to Brian P.'s birth.

During her pregnancy with Brian P., the mother tested positive for benzodiazepines, opiates, and marijuana. Upon his birth, Brian P.'s meconium tested positive for opiates, but no symptoms of withdrawal were noted. The Department of Children and Families (department) became involved on the day following Brian P.'s birth. The mother admitted her addiction to the department, but the respondents did not admit to the department that the father had substance abuse issues as well. The department, the respondents, and the paternal grandmother, collectively, entered into a voluntary service agreement. All parties agreed that Brian P. would remain in the respondents' custody while they resided at the paternal grandmother's home, that the mother was not permitted to have any unsupervised contact

with Brian P., and that the mother would participate in substance abuse treatment and counseling. No treatment was recommended for the father because, at that time, he had not admitted to having any substance abuse issues.

The mother's participation in substance abuse treatment was minimal and, after September, 2016, she received no counseling and refused all urine screens. On January 18, 2017, the department filed a neglect petition on behalf of Brian P. The respondents appeared in court on February 21, 2017, where they were advised of their rights and appointed counsel. Following their court appearance, between March and April, 2017, the respondents had no contact with the department. On April 25, 2017, the respondents entered pleas of nolo contendere, and Brian P. was adjudicated neglected. For the next six months, Brian P. remained in the respondents' custody under court-ordered protective supervision. The respondents were given specific steps to follow, including, inter alia, "that they engage in a substance abuse evaluation, cooperate with any recommended treatment, obtain and maintain sobriety, obey the law, maintain an adequate income, and, in the mother's case, cooperate with counseling."

Between May and early June, 2017, the respondents were unresponsive to the overtures of the department. On June 9, 2017,[3] Brian P.'s disposition was modified, and he was committed to the custody of the petitioner. Brian P. has been in the care and custody of the petitioner since then, living in the home of a nonrelative. The respondents consistently and appropriately have visited with Brian P. since his commitment to the custody of the petitioner. On June 14, 2017, the father admitted to the department and his family that he had been addicted to opiates for three years. At this time, the respondents' specific steps for reunification remained as set.

The mother was referred to the Connection Counseling Center (CCC) for regular, individual counseling in February, 2017. The mother failed to attend her intake appointment scheduled for March 7, 2017, and never engaged in counseling at CCC. The department unsuccessfully encouraged the mother to engage in individual counseling between August, 2017 and January, 2018. On January 19, 2018, the department referred the mother to Sound Community Services (SCS) for counseling. The mother did not schedule an intake appointment until February 27, 2018, and she failed to appear at the March 6, 2018 appointment that she had scheduled.

The mother did engage in limited treatment at The Journey to Hope, Health and Healing, Inc. (The Journey) in Rhode Island. The mother's therapist at The Journey provided a letter that reported that the mother was open and honest and committed to recovery, but the letter did not indicate that the mother was addressing

any of her underlying mental health concerns, that she had made substantial progress in recovery or that she was in long-term or permanent remission. Between June 26, 2017 and February 19, 2018, the mother submitted to twenty-eight urine screens at The Journey. Ten tested positive for illicit substances, including six for the opiate fentanyl.

From August, 2017 to January, 2018, the department recommended to the father, as it had to the mother, that he attend regular, individual counseling. The father agreed with the department's recommendation and was provided with referrals to area providers, but he did not schedule an intake appointment. On January 19, 2018, the department referred the father to SCS for counseling. The father, like the mother, did not schedule an appointment until February 27, 2018, and failed to appear at his appointment scheduled for March 6, 2018.

The father eventually began individual counseling on May 22, 2018. The father's therapist, Timothy Cormier, testified at trial that the father was making great progress on his substance abuse issues and that he was testing negative for drugs. The father reported to Cormier that he was overcoming his cravings. The father, however, misrepresented to Cormier that that he was working as a waiter. In actuality, in November, 2017, the father had been terminated from his restaurant employment due to substance abuse issues. After his firing, the father began working at another casino restaurant where he remained until he voluntarily left that employment in June, 2018. The father insisted that he could return to his previous employer if he so wished, but his employer testified that, while he would readily consider hiring the father again, there was no guarantee of employment. The father's employer provided a positive review of the father's work skills and motivation.

Between June 19, 2017 and February 23, 2018,[4] the father submitted to thirty-one drug screens. Sixteen of those screens were positive for illicit substances, including many for fentanyl. The father had multiple negative drug tests after he began individual counseling in May, 2018. The father, however, did test positive for marijuana in an August, 2018 drug screen. When explaining the positive drug test, the father claimed that he had last used marijuana in late April or on May 1, 2018. The father's own expert, however, cast doubt on that claim by opining that, on the basis of the hair test, the father had last ingested marijuana no earlier than late June, 2018.

On September 25, 2017, the mother was arrested and charged with possession of heroin after a police officer in an unmarked police vehicle observed her engaging in a drug transaction in a commercial parking lot. The mother told police that she was buying the drugs for the father. The drugs purchased by the mother tested positive for fentanyl. As a resolution to the charges, the

mother was given an opportunity to participate in a diversionary program by the criminal court, but, as of the date of trial on the termination petition, she had not satisfied her obligations under that program. The respondents did not tell the department about the mother's arrest. The department learned of it through a routine criminal background check in February, 2018. When the department approached the mother about the arrest, she acknowledged it but misrepresented the facts of the arrest in an effort to minimize its nature.

On March 29, 2018, the respondents were stopped by the police while driving the mother's car in Rhode Island because the father was not wearing a seatbelt. The respondents consented to a search of the vehicle, which led to the discovery of marijuana and prescription medicine for which neither of the respondents possessed a prescription. Narcotics also were discovered hidden on the mother's person. The father testified that he had told the police that all of the drugs found were his in an effort to protect the mother and because they had advised him that he would not be arrested if he agreed to assist them as a confidential informant. The respondents did not report the matter to the department for approximately one month, and, when the incident was reported to the department, the father stated that he had received a ticket for possession of marijuana but did not disclose that the mother was present and that narcotics were found on her person. As of the date of the trial in this matter, felony drug charges were still pending against the father in Rhode Island.

On May 22, 2018, the petitioner filed a petition to terminate the respondents' parental rights pursuant to General Statutes § 17a-112 (j) (3) (B) (i) for their failure to achieve a degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of Brian P., they could assume a responsible position in the life of Brian P. A trial on the petition was held on December 13, 14, and 17, 2018, and January 3, 2019.

On May 3, 2019, the court, *Driscoll, J.*, issued a memorandum of decision terminating the respondents' parental rights. In the adjudicatory phase,[5] the court found by clear and convincing evidence that "the department ha[d] proven . . . that it made reasonable efforts to reunify the child with the [respondents], that the [respondents] [we]re unwilling or unable to benefit from those efforts, and [that] the [respondents] ha[d] failed to rehabilitate as alleged." Though the court found "laudatory the [respondents'] recent efforts to address their addiction, and their expressed desire to beat their addiction," it also found that those efforts were "too little and too late, and [that it could not] conclude that their most recent sobriety [was] long-term."

In the dispositional phase; see footnote 5 of this opin-

ion; the court considered the seven statutory factors of § 17a-112 (k)[6] before finding "by clear and convincing evidence that termination of [the respondents'] parental rights [was] in Brian [P.'s] best interests." On May 3, 2019, the court terminated the respondents' parental rights and appointed the petitioner as Brian P.'s statutory parent. On June 7, 2019, the respondents filed this appeal. Additional facts will be set forth as necessary.

I

The respondents first claim that the court improperly concluded that they had failed to rehabilitate. Specifically, the respondents argue that it was error for the court "to terminate [their] parental rights based solely on their drug use and addiction where, as here, their drug use has never caused [them] to provide inadequate care for [Brian P.], [Brian P.] has never suffered any harm, and [they] have stopped using drugs altogether." We disagree.

We begin by setting forth the established principles of law and the standard of review. "The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. (Citations omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). "Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Citations omitted; internal quotation marks omitted.) *In re Leilah W.*, 166 Conn. App. 48, 67–68, 141 A.3d 1000 (2016).

"[The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Citation omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587. Whereas, during the adjudicatory phase of a termination

proceeding, the court is generally "limited to considering events that precede the date of the filing of the petition or the latest amendment to the petition, also known as the adjudicatory date," it "may rely on events occurring after the [adjudicatory] date . . . when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Internal quotation marks omitted.) *In re Leilah W.*, supra, 166 Conn. App. 69.

"A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587–88. "We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *In re Bianca K.*, 188 Conn. App. 259, 268–69, 203 A.3d 1280 (2019).

The court, in its memorandum of decision, based its finding that the respondents had failed to rehabilitate on multiple factors and not, as the respondents argue, solely on the basis of their drug use and addiction. The court found relevant the respondents' drug related arrests, their limited engagement in counseling and treatment, their insufficient independence in their finances and housing, and their lack of credibility.

To be sure, the respondents' drug use was a primary focus of the court's analysis. The court detailed the respondents' many positive drug tests between June, 2017 and February, 2018. The court also noted the father's August, 2018 hair test that was positive for marijuana.[7] The respondents argue that despite testimony of the mother and the father that they stopped all drug use as of April, 2018, and June, 2018, respectively, the court, instead, "relie[d] heavily upon unconfirmed urine screens submitted by the [respondents] between June, 2017 and February, 2018."[8] Relatedly, the respondents argue that the court "entirely ignore[d] all of the [respondents'] drug test results since Febru-

ary, 2018." We do not see any fault in the court considering the respondents' numerous positive urine screens prior to the filing of the termination of parental rights petition on May 22, 2018, and, thus, during the adjudicatory phase. See *In re Leilah W.*, supra, 166 Conn. App. 69. In addition, these tests, taken after the respondents were provided with specific steps for reunification, including a requirement to "[n]ot use illegal drugs," are relevant to whether those steps were followed. We also do not agree with the respondents' characterization that the court ignored their drug test results after February, 2018. The court acknowledged and found "laudatory the [respondents'] recent efforts to address their addiction" and "their most recent sobriety." This statement shows that the court considered the progress made by the respondents in their rehabilitation. That progress, however, was outweighed by the respondents' prior pattern of drug use, as evidenced by their positive urine screens, and their other instances of bad parental judgment, as described subsequently in this opinion, which led the court to conclude that the progress would not last "long-term." We cannot conclude that any of these findings were clearly erroneous. See *In re Shane M.*, supra, 318 Conn. 593 ("[a]lthough the respondent encourages us to focus on the positive aspects of his behavior and to ignore the negatives, we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court"); see also *In re Luis N.*, 175 Conn. App. 271, 304–305, 165 A.3d 1270 (trial court's conclusion that respondent failed to achieve sufficient personal rehabilitation affirmed on appeal because, despite six month period of sobriety prior to end of trial, respondent's pattern of substance abuse, including during termination proceedings, was supported by sufficient evidence), cert. denied, 327 Conn. 958, 172 A.3d 203 (2017).

As stated previously, the court also relied on the respondents' drug related arrests to find that they had failed to rehabilitate. The court found that the mother was arrested for possession of heroin on September, 25, 2017, and that the father faced felony drug charges as a result of the March 29, 2018 traffic stop. Not only did both of these incidents violate the respondents' specific step to "[n]ot get involved with the criminal justice system," but they both also involved illegal drugs, which the respondents were forbidden from using. Moreover, the court found that the respondents were not forthright with the department about these incidents and that, at trial, they "professed ignorance" or testified in "conflicting and implausible ways" that "cast grave doubts on their credibility."

The respondents argue that, "[i]f the law in this jurisdiction provides that the courts cannot terminate the respondents' parental right on the basis of incarceration, then the trial court may not do so on the basis of arrests where, as in this case, they have never been

incarcerated." We first note that the court did not base its finding that the respondents failed to rehabilitate only on their drug related arrests. Instead, the respondents' arrests were one of the factors that the court deemed relevant. Because one of the respondents' specific steps for reunification was to "[n]ot get involved with the criminal justice system," we determine that the court properly relied on the respondents' arrests, among other factors, to find that they had failed to rehabilitate.

The court also cited the respondents' limited engagement in regular, individual counseling and in treatment, and their lack of financial and housing independence to support its finding that the respondents had failed to rehabilitate. The court found that the mother had no counseling after September, 2016, and that her participation in treatment was limited. The court found that the father was slow to engage in individual counseling—not doing so until May 22, 2018—despite the department's encouragement to seek counseling since at least August, 2017. Furthermore, the court found that, due to the father's decision to leave work, the respondents lacked "adequate, independent, legal income." The court found that the respondents' housing was through the "good graces" of the paternal grandmother, where the respondents had lived for years while drug addicted, and that the respondents were contributing only some money toward that housing from an employment settlement received by the father.[9] These findings were not clearly erroneous.

Lastly, the court stated that its "conclusion is based in part upon the court's observation of the demeanor of the [respondents] while testifying. As noted, the court did not find them fully credible. They were evasive, or attempted to rationalize, or minimize their drug arrests, and any perceived negative behaviors." We do not disturb the court's credibility determinations on appeal. See, e.g., *In re Baciany R.*, 169 Conn. App. 212, 225, 150 A.3d 744 (2016) ("[w]e defer to the trier of fact's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude" [internal quotation marks omitted]). At oral argument before this court, counsel for the respondents argued that their credibility was not relevant to their failure to rehabilitate. There was nothing improper about the court factoring the respondents' credibility into its analysis because the respondents testified on their own behalf and did so in ways that conflicted with testimony presented by the petitioner. See *In re Santiago G.*, 154 Conn. App. 835, 857, 108 A.3d 1184 ("the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony" [internal quotation marks omitted]), aff'd, 318 Conn. 449, 121 A.3d 708 (2015).

The respondents argue that "evidence that [they]

used drugs, standing alone, is insufficient to terminate their parental rights without an evidentiary showing that [they] failed to provide adequate care for [Brian P.], or that [Brian P.] has ever suffered physical or psychological harm." We disagree. First, we reiterate that the respondents' drug use was not the sole basis on which the court found that they had failed to rehabilitate. Second, Brian P. already had been adjudicated neglected on April 25, 2017, after the respondents entered pleas of nolo contendere to allegations that he was "permitted to live under conditions, circumstances or associations injurious to well-being." See General Statutes § 46b-120 (4) (C). Thus, at the adjudicatory phase, the court was left only to determine whether the respondents had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Brian P., they could assume a responsible position in the life of Brian P." See General Statutes § 17a-112 (j) (3) (B); see also *In re Shane M.*, supra, 318 Conn. 585–86. For the reasons stated in part II of this opinion, we conclude that the court did consider the particular needs of Brian P. in its discussion of the adjudicatory phase of the petition.

We recognize, as did the trial court, that the respondents made efforts to address their addictions. We cannot, however, conclude that there was insufficient evidence to support the court's finding that they had failed to achieve sufficient personal rehabilitation so as to encourage the belief that the respondents could assume a responsible position in the life of Brian P. within a reasonable time.[10]

II

The respondents next claim that the "court erred as a matter of law because its memorandum of decision failed to make a finding regarding the particular needs of the child in this case, Brian P., *before* it found that [the respondents] failed to rehabilitate within the meaning of . . . § 17a-112 (j)." (Emphasis in original.) We disagree.

We begin by setting forth the standard of review. "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations that the court provides." (Internal quotation marks omitted.) *In re James O.*, 322 Conn. 636, 649, 142 A.3d 1147 (2016).

Section 17a-112 (j) (3) (B) requires the court to find

by clear and convincing evidence that a parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." "Therefore, the trial court must first determine the needs of the particular child before determining whether a parent has achieved a sufficient rehabilitative status to meet those needs." *In re James O.*, supra, 322 Conn. 650. In its memorandum of decision, the court indicated that it did consider the needs of Brian P. before determining that the respondents had failed to rehabilitate.

First, the court correctly cited to *In re Shane M.*, supra, 318 Conn. 585–86, for the standard relevant to a termination of parental rights petition, stating that, under § 17a-112, it must "analyze the [respondents'] rehabilitative status as it relates to the needs of the particular child . . . ." Second, the court stated early in its memorandum of decision that Brian P.'s "meconium was positive for opiates, but no symptoms of withdrawal were noted," thereby implying that Brian P. had no unique needs stemming from his birth. Later in its opinion, the court made that point expressly by stating that Brian P. "is a happy, healthy child with no special needs or issues, other than those shared by all children, that is, the need for a permanent, safe, supportive, nurturing home."[11] Lastly, the court summarized its findings by stating that, "*after due consideration of [Brian P.'s] need for a secure, permanent placement*, and the totality of the circumstances, and having considered all statutory criteria, and having found by clear and convincing evidence that reasonable efforts at reunification with [the respondents] were made and that father and mother were unwilling to benefit from those efforts, and *that grounds exist to terminate [the respondents'] parental rights for a failure to rehabilitate as alleged*, and that is in the child's best interest do so," before ordering the respondents' parental rights terminated. (Emphasis added.)

The court's findings that Brian P. is a "happy, healthy child with no special needs or issues" and that he has a "need for a secure, permanent placement" were expressed in the dispositional phase of its analysis, which would support the respondents' contention that the court did not consider the needs of Brian P. before concluding that they had failed to rehabilitate. While we acknowledge it may be more clear for a trial court to explicitly state the needs of the minor child at the outset of the adjudicatory phase of its analysis, we do not agree that the order of the court's findings in this case suggests that the court had failed to determine Brian P.'s needs before concluding that the respondents had failed to rehabilitate. It cannot be disputed that, at times, some of the findings relevant to the analysis in the adjudicatory phase will also be relevant to and

overlap with the analysis of the dispositional phase, and vice versa. See *In re Malachi E.*, 188 Conn. App. 426, 437–38, 204 A.3d 810 (2019) (concluding that, in dispositional phase, trial court need not "blind itself to any parental deficiencies that also were considered during the adjudicatory phase" because "the determinations made in the adjudicatory and dispositional phases may often be so intertwined that the former leads almost inexorably to the latter" [internal quotation marks omitted]). This is a case in which the court found that Brian P. had no special needs in the dispositional phase of its analysis, which is a finding that would apply with equal force in the adjudicatory phase of its analysis. Accordingly, we conclude that the court was considerate of the needs of Brian P. as it determined whether the respondents had failed to rehabilitate. See *In re James O.*, supra, 322 Conn. 649 ("Effect must be given to that which is clearly implied as well as to that which is expressed. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations that the court provides." [Internal quotation marks omitted.]).

### III

Lastly, the respondents claim that the court erroneously found that termination of their parental rights was in the best interest of Brian P. We disagree.

We first set forth the relevant principles and the standard of review. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondents'] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnote omitted; internal quotation marks omitted). *In re Joseph M.*, 158 Conn. App. 849, 868–69, 120 A.3d 1271 (2015).

The court considered and made findings under each of the seven statutory factors of § 17a-112 (k) before determining that, under the totality of the circum-

stances, a termination of the respondents' parental rights was in the best interest of Brian P. The respondents assert that a number of the court's findings made in its best interest of the child analysis were clearly erroneous. We are not convinced.

The respondents argue that the court's finding that they "did not provide Brian [P.] with a 'safe, supportive, nurturing home' " was clearly erroneous because "the petitioner admitted at trial that there was never any concern that the [respondents] were unable to provide adequate care for their child." The respondents further contend that the court's finding that Brian P. "requires a 'permanent' home, and that denying him 'the permanency to which he is entitled would not be in his best interests,' " was clearly erroneous because the court "cite[d] to no evidence to show that the child felt that his current situation lacked permanency, or that the child would suffer adverse results should he remain in foster care for some additional period prior to reunification." The trial court found that "Brian [P.] is a happy, healthy child with no special needs or issues, other than those shared by all children, that is, the need for a permanent, safe supportive, nurturing home." The court also found that Brian P. had "been in foster care for over half his life, while [the respondents] struggled greatly with their addiction, and there is no reasonable foreseeability that their addiction will be addressed permanently." Given Brian P.'s age, the amount of time he has spent in foster care—more than one-half of his life-—and the court's findings as to the respondents' failure to rehabilitate—as detailed in part I of this opinion—we cannot conclude that the court's findings as to Brian P.'s need for a "permanent, safe, supportive, nurturing home" and the respondents' inability to meet that need were clearly erroneous. See *In re Anthony H.*, 104 Conn. App. 744, 767, 936 A.2d 638 (2007) ("[o]ur appellate courts have recognized that long-term stability is critical to a child's future health and development" [internal quotation marks omitted]), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008); *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's findings as to best interest of child were not clearly erroneous when much of child's short life had been spent in custody of commissioner and child needed stability and permanency in her life).

The respondents contend that, because there is no evidence that Brian P.'s needs are not being met, the court's findings are clearly erroneous. This argument ignores the court's findings that Brian P. has lived more than one-half of his life in foster care and that "[Brian P.] looks to [his] foster mother to meet his needs . . . ." If there is no evidence that Brian P.'s needs are not being met, credit belongs to the foster mother who has been primarily responsible for meeting those needs. The court's finding that Brian P.'s needs are being met by his foster mother is consistent with both its finding

that he is in need of stability and its conclusion that termination of the respondents' parental rights is in his best interest.

The respondents also argue that the court "completely failed to consider the detrimental effect of removing [Brian P.] from his parents and grandparents, with whom he shares a close bond." The court did not overlook the bond between Brian P. and the respondents. Rather, the court stated that Brian P. "knows and loves [the respondents], and is loved by them. Parental love does not equate with parental competence, which in this case requires complete sobriety." This statement reflects that the court appreciated the bond between Brian P. and the respondents but, nevertheless, concluded that it was in his best interest to terminate the respondents' parental rights. See *In re Anthony H.*, supra, 104 Conn. App. 765–66 ("[o]ur courts consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights" [internal quotation marks omitted]).[12] We cannot conclude from our review of the record that this finding was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 6, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Brian P. is the name of both the father and the minor child. Throughout this opinion, only the minor child will be referred to as Brian P.

[2] Pursuant to Practice Book §§ 67-13 and 79a-6 (c), the attorney for Brian P. filed a statement adopting in its entirety the brief filed by the petitioner.

[3] The trial court's memorandum of decision states that Brian P. had his disposition changed and was committed to the custody of the petitioner on June 19, 2017, but that date seems to have been a scrivener's error. Those developments occurred on June 9, 2017.

[4] The court's memorandum of decision states that the father submitted to drug tests "between June 19, 2017 and February 23, 2015 . . . ." Reference to the year 2015 appears to be a scrivener's error.

[5] "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 582–83 n.12, 122 A.3d 1247 (2015).

[6] General Statutes § 17a-112 (k) states: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe

Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[7] The respondents argue that the court improperly relied on the father's marijuana use after he ceased using opiates because, in doing so, it "fail[ed] to recognize that General Statutes § 21-279a, which took effect in 2011, decriminalized the possession of small amounts of marijuana." We disagree. Although § 21-279a did decriminalize small amounts of marijuana, it remains illegal. See *State* v. *Dudley*, 332 Conn. 639, 650, 212 A.3d 1268 (2019). Section 21a-279a also did not proscribe a court from weighing an individual's marijuana use against that individual when considering a termination of parental rights petition, like the one in this case, that alleges a failure to rehabilitate from drug abuse issues. Moreover, there was nothing improper about the court considering the father's marijuana use because one of the specific steps that the respondents were required to follow for reunification was to "[n]ot use illegal drugs . . . ." See *In re Anaishaly C.*, 190 Conn. App. 667, 684, 213 A.3d 12 (2019).

[8] The respondents highlight the "uncontradicted expert testimony" of Ilie Saracovan, a drug testing expert, who testified that urine screens are not valid, final results for drug tests without additional confirmation tests, to argue that the court's "reliance on these unconfirmed drug screens, without more, is clearly erroneous." The respondents have not pointed to any authority to support their proposition that a court is barred from considering positive urine screens that have not been confirmed by what Saracovan described as "instrumental analysis where very, very sophisticated instrumentation is used." To the contrary, our case law is replete with myriad examples of courts relying on such urine screens in termination of parental rights cases. See, e.g., *In re Briana G.*, 183 Conn. App. 724, 731, 193 A.3d 1283 (2018); *In re Kaitlyn A.*, 118 Conn. App. 14, 19, 28, 982 A.2d 253 (2009); *In re Ryan R.*, 102 Conn. App. 608, 622, 624–25, 926 A.2d 690, cert. denied, 284 Conn. 923, 933 A.2d 724, and cert. denied, 284 Conn. 924, 933 A.2d 724 (2007).

[9] The respondents argue that the court impermissibly "appears to add several requirements to [their] specific steps that were not part of the original court order," including that (1) they "were required to find independent housing as a requirement for reunification," (2) they "had an obligation to challenge [the department's] right to reduce their visitation privileges," and (3) their "failure to enter a methadone program suggested by [the department] is evidence of their failure to rehabilitate." We disagree.

With respect to the alleged first additional step, given that the respondents were addicted to opiates while residing at the paternal grandmother's home, it was not clearly erroneous for the court to conclude that the respondents were not maintaining adequate housing, which was a previously ordered step for them to follow.

We do not agree that the court added an alleged second additional step when it stated that they had not contested the reduction of their visitation with Brian P. We read the court's statement as an explanation that, in light of the respondents' failure to challenge the department's decision to reduce their visitation, it could base its own findings on the department's underlying justification for that decision, namely, that Brian P. displayed adverse behavioral effects when the respondents' visits with him were more frequent.

Turning to the third specific step allegedly added, we do not agree that the court required the respondents to enter a methadone program selected

by the department. Instead, the court's statement that the respondents "did not enter [a methadone] program to which [the department] referred them" appears to correspond with its expressed concerns about the respondents' inconsistent engagement in counseling and treatment, and their lack of credibility. Given the court's stated concerns, it was not clearly erroneous for it to view with disfavor the decision of the respondents to select their own methadone clinic in the first place.

[10] The respondents argue that the court's finding that their efforts to rehabilitate were "too little and too late" was belied by the department's own statements in 2018. In particular, the respondents claim that on April 27, 2018, a department employee told them "that if they stayed clean of drugs and engaged in counseling, then they could 'actually reunify with Brian [P.].' " The respondents also claim that, on July 3, 2018, the father's therapist was told that the termination of parental rights petition could still be withdrawn and Brian P. could be returned to the respondents if they stopped using drugs. The court heard the testimony regarding both of these statements, but, nevertheless, concluded that, under the totality of the circumstances, the respondents had failed to rehabilitate. We conclude that there was sufficient evidence to support that finding.

[11] At oral argument before this court, the respondents' counsel argued that, because Brian P. did not have any special needs, the respondents would not need to be "as up to speed." We disagree. A child, particularly one of Brian P.'s age, invariably requires the attention of a sober and responsible parent regardless of whether that child has identified special needs.

[12] The respondents state that the termination of the respondents' parental rights will also result in a permanent severance of Brian P.'s strong bond with his four grandparents, seeming to argue that this was a factor that the court should have considered. This bond is not a consideration that is encompassed in any of the seven statutory factors found in § 17a-112 (k). Therefore, the court's failure to consider it was not clearly erroneous.

---