******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

IN RE NOVEMBER H.*
(AC 44120)

Moll, Suarez and DiPentima, Js.

*Syllabus*

The respondent father appealed to this court from the judgment of the trial court terminating his parental rights with respect to his minor child, N, who had previously been adjudicated neglected. The father has been incarcerated for the entirety of N's life, and N was unaware that he was her father until after she was approximately seven years old and in the care of the petitioner, the Commissioner of Children and Families. The father claimed that the trial court made internally inconsistent statements regarding his parent-child relationship with N, there was insufficient evidence to support the court's determination that he failed to achieve the requisite degree of personal rehabilitation as would encourage the belief that within a reasonable time he could assume a responsible position in N's life as required by the applicable statute (§ 17a-112), the court improperly relied on its finding that additional time was necessary for him to develop a normal and healthy parent-child relationship with N when the petitioner and N's mother interfered with his ability to develop the relationship, and the court improperly compared him to N's foster parent in the adjudicatory portion of its decision. *Held*:

1. The respondent father could not prevail on his claim that the trial court's determination that the petitioner failed to sustain her burden to demonstrate that there was no parent-child relationship between him and N was internally inconsistent with its findings that he did not have a normal and healthy or meaningful parent-child relationship with N; although there was evidence in the record that N's feelings toward her father were continuing and positive, this did not preclude the court's conclusion that the father and N did not share a normal and healthy or meaningful relationship, as the court found that N's mother had prevented the father from maintaining a meaningful relationship with N and that the father's continued incarceration and N's fear of visiting prison formed a barrier to the development of a normal and healthy bond, and the time it would take to form such a bond was unclear.

2. The trial correct correctly determined that there was clear and convincing evidence in the record that the respondent father failed to sufficiently rehabilitate within a reasonable time pursuant to § 17a-112 (j) (3) (B) (i).

   a. The father's claim that the court's finding that additional time was necessary for him and N to develop a normal and healthy parent-child relationship was clearly erroneous was unavailing: although there was evidence in the record that demonstrated that N wanted to visit her father but was afraid to do so in prison, requested photographs of him, wrote a letter to him asking him questions about himself and expressed feelings of missing him during supervised telephone calls, as well as evidence that the father made consistent efforts for visitation with N, sent N letters, birthday cards and photographs, and had multiple supervised telephone conversations with N during which he provided parental advice, it was undisputed that the father had been incarcerated for N's entire life, during the majority of which N did not know of his existence, N was fearful to visit him in prison, and, at the time of trial, N had not communicated with him in almost one year as it was not recommended by N's clinicians; moreover, it was undisputed that N had significant psychological and emotional needs created by the trauma N had experienced and the court did not err in finding that the father would not achieve a sufficient rehabilitative status within a reasonable time to meet those needs.

   b. The father's claim that the court's finding that he would be responsible for providing housing and financial support to N within a reasonable time was clearly erroneous was unavailing; although the father claimed that there was no evidence in the record that N would not remain in the residential placement in which N was living at the time of trial following his release from incarceration, N's social worker provided

testimony that N's placement team had a goal to stabilize and to release N from the placement within two months, which was approximately four years earlier than the respondent's maximum release date from incarceration.

3. The respondent father could not prevail on his claim that the conduct of the petitioner and N's mother constituted interference with his ability to establish a normal and healthy parent-child relationship with N and, thus, the trial court impermissibly terminated his parental rights on the ground of its finding that additional time was necessary for him to form such a relationship with N; there was undisputed evidence that N's mother, and not the petitioner, prevented the initial development of a normal and healthy parent-child relationship between the father and N, and thus, because the interference exception is applicable only when the petitioner has engaged in conduct that led to the lack of an ongoing parent-child relationship, the conduct of N's mother as a third party could not trigger the interference exception to § 17a-112 (j) (3) (D) as a matter of fact.

4. The trial court did not make an improper comparison between the respondent father and N's foster parent in determining that the father had failed to sufficiently rehabilitate; viewed in the context of its decision as a whole, the court's statements regarding the foster parent's ability to meet N's needs and the stability N had found in the foster home served to highlight N's particular needs and the father's inability to meet those needs within a reasonable time, and the court did not opine that the foster parent was or should be the only person who could meet N's needs.

Argued November 12, 2020—officially released December 31, 2020**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Hon. Robert G. Gilligan*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondent father filed an appeal to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, with whom, on the brief, was *Amir Shaikh*, for the appellant (respondent father).

*Krystal L. Ramos*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Stephen G. Vitelli*, *Jessica Gauvin* and *Evan O'Roark*, assistant attorneys general, for the appellee (petitioner).

*Robert Johnson Moore*, for the minor child.

*Opinion*

MOLL, J. The respondent father, Marcus H., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights as to his minor daughter, November H., on the ground that he failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (i).[1] On appeal, the respondent claims that (1) the court made internally inconsistent statements regarding his parent-child relationship with November, (2) there was insufficient evidence supporting the court's determination that he failed to sufficiently rehabilitate, (3) as a matter of law, the court, in terminating his parental rights, improperly relied on its finding that additional time was necessary for him and November to develop a "normal and healthy" parent-child relationship when the petitioner and November's mother, Natachia G., interfered with his ability to develop such a relationship, and (4) the court improperly compared him to November's foster parent in the adjudicatory part of its decision. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The respondent and Natachia G. began a relationship in 2010. November was born in 2011. The respondent has been incarcerated for the entirety of November's life, and he remains incarcerated with a maximum release date in March, 2024.[2] Although Natachia G. informed the respondent of November's birth, she refused to permit the respondent to have contact with November and declined to disclose the respondent's identity to November. November was unaware that the respondent was her father until May, 2018, when, in a therapeutic setting, the petitioner and a clinician informed November of the respondent's relationship to her. Prior to that disclosure, November believed that a man named Patrick G., whom Natachia G. had married in February, 2016, was her father.

On June 24, 2017, police officers responded to a call reporting that Natachia G., while intoxicated, had stabbed Patrick G. in the presence of November and two of Natachia G.'s other children. Natachia G. was arrested and charged with several crimes in connection with the stabbing. On June 27, 2017, the petitioner invoked a ninety-six hour hold on November and removed her from her home. On June 29, 2017, the petitioner applied for an ex parte order of temporary custody and filed a neglect petition in the interest of November. The same day, the trial court, *Dannehy, J.*, issued an order of temporary custody, which was subsequently sustained by the court, *Burgdorff, J.*, on July 7, 2017. On October 10, 2017, November was adjudicated neglected by the court, *Dyer, J.*, and committed to the care and custody of the petitioner. The court

also ordered specific steps for the respondent to take to facilitate his reunification with November. On November 22, 2017, November was placed in the custody of a foster mother, who is a cousin of Natachia G.

On March 5, 2019, the petitioner filed a motion to review and approve a permanency plan of termination of parental rights and adoption in the interest of November. On April 25, 2019, following a hearing, the court, *Hon. Robert G. Gilligan*, judge trial referee, granted the motion. On June 20, 2019, the petitioner filed a petition to terminate the parental rights of the respondent with respect to November (petition).[3] In support thereof, the petitioner alleged three grounds for termination: (1) under § 17a-112 (j) (3) (A), the respondent had abandoned November; (2) under § 17a-112 (j) (3) (B) (i), November had been found to be neglected, abused, or uncared for in a prior proceeding and the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of November, he could assume a responsible position in her life; and (3) under § 17a-112 (j) (3) (D), there was no ongoing parent-child relationship between the respondent and November.

A trial on the petition was conducted on February 4, 2020. The respondent appeared and was represented by appointed counsel. Numerous witnesses testified, including the respondent.

On April 9, 2020, the court issued a memorandum of decision terminating the parental rights of the respondent. The court determined that the petitioner failed to demonstrate, by clear and convincing evidence, abandonment under § 17a-112 (j) (3) (A) or a lack of an ongoing parent-child relationship under § 17a-112 (j) (3) (D), but that the petitioner met her burden of proof to establish that November had been adjudicated neglected on October 10, 2017, and that the respondent had failed to sufficiently rehabilitate under § 17a-112 (j) (3) (B) (i). The court also found that the petitioner had made reasonable efforts to locate the respondent and to reunify him with November.

In determining that the respondent had failed to sufficiently rehabilitate, the court relied on the following relevant findings concerning November. "[At the time of trial] November . . . [was] eight years old. November was removed by [the petitioner] on June 28, 2017, and was placed in a relative foster home with her sister . . . on November 22, 2017. . . . At the time of trial, November was placed at Eagle House where she was receiving care and services provided by the Village for Families and Children due to her recent emotional dysregulation. November receives weekend passes to her foster home.

"November has witnessed substance abuse, domestic

violence, police involvement, parental incarceration and adult mental health problems while residing with [Natachia G.]. Until she was therapeutically told by her clinician and [the petitioner] in May, 2018 that [the respondent] is her father, November believed that Patrick G., with whom she lived, was her father. Following the death of Patrick G. in August, 2017, [the petitioner] referred November to mental health counseling to address her behavior issues resulting from her neglect and trauma from witnessing [Natachia G.] stab Patrick G. and to process her grief in connection with Patrick G.'s death.[4] . . .

"November has been diagnosed with anxiety, [attention deficit hyperactivity disorder], and [post-traumatic stress disorder] as a result of the multiple traumas she has experienced. November suffers from suicidal ideations.

"November began therapy with a therapist, Milagros Montalvo-Stewart, in September, 2017. November met with Montalvo-Stewart weekly to address her trauma and coping skills. November left therapy with Montalvo-Stewart when she began exhibiting unsafe behaviors including suicidal ideations by running into the street. November's behaviors at school and in her foster home escalated including getting physical with others, refusal to follow rules, screaming and running out of the school building. [The petitioner] made a referral to [Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS)][5] in January, 2019, to address November's behaviors. IICAPS met with November two to three times per week in the home and at school, which was followed by November's entering the Institute of Living (IOL) intensive outpatient services in April, 2019, where she was scheduled to attend three day[s] per week. November's clinician at the IOL reported that November had a breakdown on April 26, 2019, started to cry and said she missed her mother. . . . On April 29, 2019, November had another breakdown, said she wanted to kill herself and had to be physically restrained from running into the street. She was taken from the IOL to [the Connecticut Children's Medical Center] on an emergency basis and later admitted inpatient to the IOL on May 3, 2019. On May 13, 2019, November's clinician reported that she continued to state that she wanted to kill herself and continued to believe that [Natachia G.] had killed Patrick G. November's foster mother testified that November said she wanted to go to heaven to 'get Daddy Patrick.' Social worker [Nadia] Pelaez testified that when asked if she could be granted three wishes, what she would wish for, November said she only needed one wish, which was to have 'Daddy Patrick' back. On May 15, 2019, the IOL recommended that November be placed at Eagle House at the Village for Families and Children, where she was receiving services at the time of trial. . . .

"[At the time of trial] November [was] in second grade. Educationally, November is described as 'solid average student but struggles behaviorally and emotionally.' " (Citations omitted; footnotes added.)

The court also made the following relevant findings regarding the respondent. "[At the time of trial, the respondent] . . . [was] thirty-eight years old. [The respondent] has been involved with [the petitioner] since 1983 as a result of his having been abandoned as a child. The parental rights of both [of] his parents were terminated in 1989 when he was seven years old. As a teenager, [the respondent] was placed by [the petitioner] seven different times from [March 26, 1996] to [July 31, 1998], from which placements he disrupted due to his oppositional behavior. [The respondent] signed himself out of [the petitioner's] care in 2000.

"[The respondent] denies any mental health issues but according to the [petitioner's] social study, a review [of the petitioner's] records [reflected] a diagnosis of [a]ttachment [d]isorder and behavioral disorders. . . .

"[The respondent] is a convicted felon with a lengthy record of arrests dating back to 2002, including arrests for threatening, sexual assault, criminal mischief, violation of protective order, failure to appear and violation of probation. [The respondent] is currently incarcerated for [manslaughter in the second degree] and evading responsibility in connection with a motor vehicle incident.[6]" (Citation omitted; footnote added.)

Additionally, the court found that the respondent's specific steps "directed him to secure 'parenting and [domestic violence]' services, as available," through the Department of Correction, and that, while incarcerated, the respondent had completed domestic violence, anger management, and parenting programs. The court also noted that the respondent testified that he had received a certificate in business administration, enrolled in business and computer classes through a community college, and earned thirty-six hours toward an associate's degree. Although observing that the respondent "is to be commended for his conduct while incarcerated and his efforts at self-improvement, which auger well for his ability to successfully reenter society at some future point in time," the court stated that "[i]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) The court found that, notwithstanding evidence reflecting a possibility that the respondent could be released from prison in 2020, the respondent's maximum release date is in March, 2024, and, regardless of his final release date, the respondent acknowledged that he will be required to remain in a halfway house "for some period of time before he can

fully reenter society." The court also found that November feared visiting the respondent in prison and that "November's fear of prison and reluctance to visit [the respondent] clearly is a barrier to the formation of [a] normal and healthy parent-child bond that develops from regular contact . . . rather than one based on correspondence." (Citation omitted.)

The court continued: "In view of the obstacles that [the respondent's] current incarceration present, the time required for [the respondent] to establish a normal and healthy parent-child relationship [with November] is unclear. Once he is released from prison, [the respondent] will need time to find housing and employment and time to devote to attending appointments with November and supporting the many services required to address her many needs. If [the respondent's] release date of 2024 remains the same, November will be an adolescent when he is released with the increased challenges that accompany adolescence. . . .

"The evidence shows that stability has been missing in November's life. November has found stability in her foster home where her foster mother has cared for her and [her sister] since November 22, 2017, except for November's periods of hospitalization. [The] [f]oster mother visits with November at Eagle House one day per week. November's foster mother testified that November's unsafe behaviors have continued in the foster home, including getting physical with [the] foster mother's nineteen year old daughter. Social worker [Amber] Orvis testified that November's foster mother redirects November and 'doesn't push her.' [Orvis] described [the] foster mother as affectionate and bonded with November . . . . Having found a relative degree of stability, November now needs permanence. [The] [f]oster mother has expressed that she wants to be a long term adoptive resource for November . . . . November is in need of a safe and permanent home with a proven competent caretaker because neither biological parent is capable of providing such a home for her within a reasonable time." (Citations omitted.)

In light of the foregoing findings, the court determined that there was clear and convincing evidence that the respondent had failed to sufficiently rehabilitate under § 17a-112 (j) (3) (B) (1). The court proceeded to determine that terminating the respondent's parental rights was in November's best interest. Accordingly, the court rendered judgment terminating the parental rights of the respondent and appointing the petitioner as November's statutory parent. This appeal followed.[7] Additional facts and procedural history will be set forth as necessary.

Before turning to the respondent's claims, we set forth the following relevant legal principles. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition

to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019).

Section 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

I

The respondent first claims that the trial court, in its memorandum of decision, made internally inconsistent statements regarding his parent-child relationship with November, and, thus, reversal of the judgment terminating his parental rights is warranted. We are not persuaded.

Resolving the respondent's claim requires us to inter-

pret the court's judgment. "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations [if any] that the court provides. . . . [W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) *In re Xavier H.*, 201 Conn. App. 81, 95, 240 A.3d 1087, cert. denied, 335 Conn. 981,    A.3d (2020), and cert. denied, 335 Conn. 982,    A.3d (2020).

"Inconsistent statements can warrant reversal of a trial court's order. *In re Pedro J. C.*, 154 Conn. App. 517, 531, 105 A.3d 943 (2014) ('[t]here are instances in which the trial court's orders warrant reversal because they are logically inconsistent rulings'), overruled in part on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 335 n.17, 173 A.3d 928 (2017)." *In re Ava W.*,    Conn.    ,    ,    A.3d    (2020); see also *In re Jacob W.*, 178 Conn. App. 195, 215–19, 172 A.3d 1274 (2017) (concluding that, even if trial court had applied proper legal test, reversal of judgment was warranted on basis of fundamentally inconsistent findings by court that grandparents' unreasonable conduct interfered with father's parent-child relationship with children and that there was no evidence of unreasonable interference by any person), aff'd, 330 Conn. 744, 200 A.3d 1091 (2019).

The following additional facts are relevant to our resolution of this claim. In the adjudicatory part of its decision, the court first determined that the petitioner failed to establish two of the three grounds for termination alleged in the petition, including that the respondent and November lacked an ongoing parent-child relationship under § 17a-112 (j) (3) (D). In making that determination, the court stated that "§ 17a-112 (j) (3) (D) requires the court to find that there is *no* parent-child relationship. . . . [T]here was ample evidence in [the petitioner's] own exhibits to prove that, at the time of the filing of the petition, November's feelings toward [the respondent] were continuing and positive. [The petitioner] has failed to prove, by clear and convincing evidence, the lack of an ongoing parent-child relationship between [the respondent] and November." (Citation omitted; emphasis in original.)

Thereafter, the court determined that the petitioner sustained her burden to prove that the respondent had failed to sufficiently rehabilitate under § 17a-112 (j) (3) (B) (i). In support of that determination, the court found, inter alia, that the respondent's incarceration presented obstacles such that "the time required for [the respondent] to establish a normal and healthy parent-child relationship [with November] is unclear." The court further found that "November's fear of prison and reluctance to visit [the respondent] clearly is a barrier to the formation of [a] normal and healthy parent-child bond that develops from regular contact . . . rather than one based on correspondence." (Citation omitted.) Additionally, in the dispositional part of its decision, the court found that "[t]here was substantial evidence that [the respondent] was prevented by [Natachia G.] from maintaining a meaningful relationship with November . . . ."

The respondent contends that the court's determination that the petitioner failed to prove a lack of an ongoing parent-child relationship under § 17a-112 (j) (3) (D) is internally inconsistent with the court's subsequent findings that he did not have a "normal and healthy" or "meaningful" parent-child relationship with November. We disagree.

In seeking to terminate parental rights under § 17a-112 (j) (3) (D), the petitioner must demonstrate by clear and convincing evidence that "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ." General Statutes § 17a-112 (j) (3) (D). Our Supreme Court has explained that "[i]n its interpretation of the language of [the lack of an ongoing parent-child relationship ground], th[e] court has been careful to avoid placing insurmountable burden[s] on noncustodial parents. . . . Because of that concern, we have explicitly rejected a literal interpretation of the statute, which defines the relationship as one that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child. . . . [D]ay-to-day absence alone, we clarified, is insufficient to support a finding of no ongoing parent-child relationship. . . . We also have rejected the notion that termination may be predicated on the lack of a *meaningful* relationship, explaining that the statute requires that there be *no* relationship." (Emphasis in original; internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 326.

In the present case, the court found that November exhibited continuing and positive feelings for the

respondent, and, therefore, the court determined that the petitioner failed to sustain her burden to demonstrate that there was *no* parent-child relationship between the respondent and November. The petitioner's failure to establish that *no* parent-child relationship existed between the respondent and November does not inevitably lead to the conclusion that the respondent and November shared a "normal and healthy" or "meaningful" parent-child relationship. Accordingly, we reject the respondent's claim that the court's decision was internally inconsistent.

## II

The respondent next claims that there was insufficient evidence in the record to support the trial court's determination that he had failed to sufficiently rehabilitate under § 17a-112 (j) (3) (B) (i). We disagree.

We begin by setting forth the following legal principles and standard of review applicable to the respondent's claim. "Pursuant to § 17a-112, [t]he trial court is required . . . to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the [Department of Children and Families]. . . .

"When a child is taken into the [petitioner's] custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights. . . . Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of [parental] rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have

achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Omar I.*, 197 Conn. App. 499, 578–79, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091 (2020).

As our Supreme Court has clarified, "[w]e have historically reviewed for clear error *both* the trial court's subordinate factual findings and its determination that a parent has failed to rehabilitate. . . . While we remain convinced that clear error review is appropriate for the trial court's subordinate factual findings, we now recognize that the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly, we now believe that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015).

"A [subordinate factual] finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Omar I.*, supra, 197 Conn. App. 579–80.

The respondent contends that the court improperly determined that there was clear and convincing evidence demonstrating that he had failed to sufficiently rehabilitate. More specifically, the respondent asserts that the following subordinate findings made by the court were clearly erroneous: (1) additional time was necessary for the respondent to develop a "normal and

healthy" parent-child relationship with November; and (2) the respondent would be responsible for providing financial support and housing to November upon his release from prison. We disagree with the respondent's claim.

A

The respondent first asserts that the court committed clear error in finding that additional time was necessary for him to develop a "normal and healthy" parent-child relationship with November, contending that the evidence in the record demonstrated that he had such a relationship with November.[8] In support of his claim, the respondent relies on the court's finding—in determining that the petitioner failed to demonstrate under § 17a-112 (j) (3) (D) that the respondent and November had no ongoing parent-child relationship— that November had "continuing and positive feelings" for him on the basis of evidence reflecting that (1) November wanted to visit him, but she was frightened of doing so in prison, (2) November requested photographs of him, (3) November wrote a letter to him asking him questions about himself, and (4) he and November had supervised telephone calls during which November expressed that she missed him. In addition, the respondent contends that he had positive feelings for November, citing evidence in the record reflecting that (1) he made consistent efforts to visit November, including filing a motion seeking monthly visitation, which was denied in January, 2019, and (2) he sent letters, birthday cards, and photographs of himself to November and had multiple supervised telephone calls with November. The respondent also asserts that his incarceration does not inhibit him from maintaining a "normal and healthy" parent-child relationship with November, relying on evidence in the record demonstrating that he previously provided parental advice to November during a supervised telephone call in April, 2019.[9]

In addressing the respondent's claim, we are mindful of the following legal principles. "[A]s to noncustodial parents, [t]he evidence regarding the nature of the [parent's] relationship with [his or her] child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation had been permitted." (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 758, 200 A.3d 1091 (2019). Additionally, it is well established that "the fact of incarceration, in and of itself, cannot be the basis for a termination of parental rights. . . . At the same time, a court properly may take into consideration the inevitable effects of incarceration on an individual's ability to assume his or her role as a parent. . . . Extended incarceration severely hinders the [Department of Children and Families'] ability to offer services and the parent's ability to make and demonstrate the changes

that would enable reunification of the family. . . . This is particularly the case when a parent has been incarcerated for much or all of his or her child's life and, as a result, the normal parent-child bond that develops from regular contact instead is weak or absent." (Citations omitted; internal quotation marks omitted.) Id., 756–57. We also emphasize that, in determining whether a parent has sufficiently rehabilitated under § 17a-112 (j) (3) (B) (i), the age and needs of the child are the critical considerations. See General Statutes § 17a-112 (j) (3) (B) (i); *In re Omar I.*, supra, 197 Conn. App. 579 ("[i]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue" (internal quotation marks omitted)).

Although the findings of the court and the evidence cited by the respondent tend to show that a parent-child relationship existed between the respondent and November, there was ample evidence supporting the court's finding that they did not share a "normal and healthy" parent-child relationship and that additional time would be required after the respondent's release from prison to establish one. It is undisputed that the respondent has been incarcerated for the entirety of November's life, that November did not discover that the respondent was her father until May, 2018, and that November was too fearful to visit the respondent in prison. In addition, the record contained the following uncontroverted evidence. According to the collective testimonies of Nadia Pelaez and Amber Orvis, who were assigned to November's case as social workers, and Emily Sybert, November's clinician at Eagle House, at the time of trial, November had not communicated with the respondent since April, 2019, as ongoing communication between them was not recommended by November's clinicians. Sybert also testified that since November's entry into Eagle House in July, 2019, November had not spoken about the respondent, but she had expressed that she missed Patrick G., whom she referred to as "Daddy Patrick."

Furthermore, it is undisputed that November, who was eight years old at the time of trial, has "many psychological and emotional needs created by the trauma she has experienced," which manifested in physically aggressive and unsafe behaviors, as well as repeated suicidal ideations. Although the respondent may have dispensed general guidance and advice to November over the telephone, in light of November's significant mental health needs, the court did not err in finding that the respondent would not achieve a sufficient rehabilitative status within a reasonable time to meet those needs.

In sum, we conclude that the evidence in the record was sufficient to support the court's finding that the

respondent and November did not share a "normal and healthy" parent-child relationship. Thus, we reject the respondent's claim that the court's finding that additional time was necessary for the respondent and November to develop such a relationship was clearly erroneous.

### B

The respondent also contends that the court's finding that he "will need to find housing and gainful employment to be able to support November" after his release from prison was clearly erroneous. Specifically, the respondent asserts that there was no evidence in the record establishing that November would no longer be residing at Eagle House at the time of his release from prison, and, therefore, the court improperly speculated that he would need to provide November with housing and financial support following the end of his incarceration.[10] We disagree.

The following additional facts are relevant to our resolution of this claim. During trial, Sybert testified that, in July, 2019, November began residing and attending school at Eagle House, which Sybert described as "a partial residential placement" that is a "step down from a hospital setting," although November has been permitted overnight visits with her foster mother. Sybert also testified that "Eagle House's goal is stabilization. So we're trying to get it so November is no longer going to the hospital with the end goal that she will go and discharge to [her foster mother]." Sybert further testified that she was "hoping" that November would be released from Eagle House and into her foster mother's care within "two months max" following trial.

Sybert's uncontroverted testimony that the goal of November's residency at Eagle House was to stabilize November and to prepare her to be discharged to her foster mother's care, which Sybert expected would occur within two months following trial, coupled with the undisputed evidence that the respondent's maximum release date from prison is March, 2024, constitutes sufficient evidence supporting the court's finding that the respondent would be responsible for providing housing and financial support to November within a reasonable time. Thus, we reject the respondent's claim that the court's finding was clearly erroneous.

### III

The respondent next claims that the petitioner and Natachia G. hindered his ability to establish a "normal and healthy" parent-child relationship with November, and, therefore, as a matter of law, the trial court could not terminate his parental rights under § 17a-112 (j) (3) (B) (i) on the basis of its finding that additional time was necessary for the respondent and November to form such a relationship. For the reasons that follow, this claim is unavailing.

In asserting this claim, the respondent urges this court to import, as a matter of law, the interference exception applicable when the proffered basis for termination of parental rights is no ongoing parent-child relationship. We begin our analysis, therefore, with a review of the legal test and exceptions applicable in that context. Our Supreme Court recently clarified "the proper legal test to apply when a petitioner seeks to terminate a parent's rights on the basis of no ongoing parent-child relationship . . . . [T]he inquiry is a two step process. In the first step, a petitioner must prove the lack of an ongoing parent-child relationship by clear and convincing evidence. In other words, the petitioner must prove by clear and convincing evidence that the child has no present memories or feelings for the natural parent that are positive in nature. If the petitioner is unable to prove a lack of an ongoing parent-child relationship by clear and convincing evidence, the petition [for termination of parental rights] must be denied, and there is no need to proceed to the second step of the inquiry. If, and only if, the petitioner has proven a lack of an ongoing parent-child relationship does the inquiry proceed to the second step, whereby the petitioner must prove by clear and convincing evidence that to allow further time for the establishment or reestablishment of the relationship would be contrary to the best interests of the child. Only then may the court proceed to the disposition phase.

"There are two exceptions to the general rule that the existence of an ongoing parent-child relationship is determined by looking to the present feelings and memories of the child toward the respondent parent. The first exception . . . applies when the child is an infant, and that exception changes the focus of the first step of the inquiry. . . . [W]hen a child is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence, it makes no sense to inquire as to the infant's feelings, and the proper inquiry focuses on whether the parent has positive feelings toward the child. . . . Under those circumstances, it is appropriate to consider the conduct of a respondent parent.

"The second exception . . . applies when the petitioner has engaged in conduct that inevitably has led to the lack of an ongoing parent-child relationship between the respondent parent and the child. This exception precludes the petitioner from relying on the lack of an ongoing parent-child relationship as a basis for termination. Under these circumstances, even if neither the respondent parent nor the child has present positive feelings for the other, and, even if the child lacks any present memories of the respondent parent, the petitioner is precluded from relying on [the lack of an ongoing parent-child relationship] as a basis for termination. . . . The interference inquiry properly

focuses not on the petitioner's intent in engaging in the conduct at issue, but on the consequences of that conduct. In other words, the question is whether the petitioner engaged in conduct that inevitably led to a noncustodial parent's lack of an ongoing parent-child relationship. If the answer to that question is yes, the petitioner will be precluded from relying on the ground of no ongoing parent-child relationship as a basis for termination regardless of the petitioner's intent—or not—to interfere." (Citation omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *In re Tresin J.*, supra, 334 Conn. 326–28. It is this second exception that the respondent seeks to have this court adopt in the context of the failure to rehabilitate ground.[11]

The following additional background, which relates to the court's analysis of the no ongoing parent-child relationship ground, as well as the failure to rehabilitate ground, is relevant to our disposition of this claim. In addressing the petitioner's allegation that no ongoing parent-child relationship existed between the respondent and November under § 17a-112 (j) (3) (D), the court first set forth the applicable legal standard and acknowledged the interference exception, observing that the petitioner cannot rely on § 17a-112 (j) (3) (D) as a ground for termination "when the petitioner has engaged in conduct that inevitably led to the lack of an ongoing parent-child relationship between the respondent parent and the child." (Internal quotation marks omitted.) The court then rejected the applicability of the interference exception because it found that Natachia G., not the petitioner, had thwarted the respondent's efforts to visit and contact November. The court proceeded to consider, and reject, the merits of the petitioner's allegation that there was no ongoing parent-child relationship between the respondent and November. Subsequently, the court determined that the respondent had failed to sufficiently rehabilitate under § 17a-112 (j) (3) (B) (i), inter alia, on the basis of its finding that additional time was needed for the respondent and November to develop a "normal and healthy" parent-child relationship. The court did not discuss the interference exception in determining that the respondent had not sufficiently rehabilitated.

The respondent asserts that (1) the interference exception to § 17a-112 (j) (3) (D) (i.e., no ongoing parent-child relationship) should apply to the § 17a-112 (j) (3) (B) (i) (failure to rehabilitate) ground for termination alleged by the petitioner in the present case, and (2) as a matter of law, the interference exception precluded the court from predicating the termination of his parental rights on its finding that he did not have a "normal and healthy" parent-child relationship with November when the petitioner and Natachia G. interfered with his efforts to develop such a relationship. Even assuming arguendo that the interference excep-

tion were available as a matter of law to § 17a-112 (j) (3) (B) (i),[12] we conclude that the exception is otherwise inapplicable under the facts of this case.

The applicability of the interference exception under the facts of this case presents a question of law over which we exercise plenary review. See *Gershon* v. *Back*, 201 Conn. App. 225, 244,     A.3d     (2020) ("[t]he plenary standard of review applies to questions of law").

Recently, in *In re Tresin J.*, our Supreme Court expounded on the parameters of the interference exception. Of import, the court stated that "[o]ur case law makes clear that the interference exception is akin to the equitable doctrine of 'clean hands' and is triggered *only by the conduct of the petitioner rather than that of a third party or some other external factor that occasioned the separation.* . . . Compare *In re Jacob W.*, supra, 330 Conn. 766–67 (interference exception was inapplicable to grandparent petitioners who 'played no role in setting the protective order' that effectively precluded respondent father from contacting children during his incarceration), and *In re Alexander C.*, [67 Conn. App. 417, 424–25, 787 A.2d 608 (2001)] (interference exception was inapplicable because, although child was placed in foster care within days of birth, 'the respondent, rather than the [petitioner], created the circumstances that caused and perpetuated the lack of an ongoing relationship' by committing physical and sexual abuse of minor child's sibling that resulted in his incarceration and entry of protective order) [aff'd, 262 Conn. 308, 813 A.2d 87 (2003)], with *In re Valerie D.*, [223 Conn. 492, 531–34, 613 A.2d 748 (1992)] ([Department of Children and Families] was precluded from relying on lack of ongoing parent-child relationship ground when it took temporary custody of child within days of her birth because of mother's continued cocaine use, with only few months having elapsed between department taking custody and termination hearing, because 'once the child had been placed in foster care . . . a finding of a lack of an ongoing parent-child relationship three and one-half months later was inevitable . . . because absent extraordinary and heroic efforts by the respondent, the petitioner was destined to have established the absence of such a relationship'), and *In re Carla C.*, [167 Conn. App. 248, 253–56, 262, 143 A.3d 677 (2016)] (interference exception was applicable when petitioner mother, who was custodial parent, obtained order from prison in which respondent father was incarcerated barring him from all oral or written communication with her and child, discarded cards and letters that he sent to child, and filed motion to suspend child's visitation with father on ground that it was 'unworkable')." (Emphasis added; footnote omitted.) *In re Tresin J.*, supra, 334 Conn. 332–33.

Additionally, our Supreme Court rejected a respon-

dent parent's claim that the Department of Children and Families' purported interference with his attempts to reestablish contact with his child invoked the interference exception, stating that "the interference exception . . . applies when the actions of the petitioner rendered inevitable the *initial* lack of a relationship, which in [that] case had occurred several years before the [Department of Children and Families] became involved with the respondent and his family. See *In re Jacob W.*, supra, 330 Conn. 766–67; *In re Valerie D.*, supra, 223 Conn. 533–34. Put differently, it was not the [Department of Children and Families'] opposition to visitation on the recommendation of [the child's] clinicians, who deemed it potentially disruptive to the progress that he was making with his foster mother, [that] resulted in the separation that led to the lack of a parent-child relationship." (Emphasis in original.) *In re Tresin J.*, supra, 334 Conn. 332 n.12.

Guided by the rationale of *In re Tresin J.*, we conclude that the respondent's reliance on the interference exception is misplaced. Although the court found that Natachia G. had interfered with the respondent's attempts to visit and contact November, Natachia G. is not the petitioner in the present action, and, thus, her conduct *as a third party* could not trigger the interference exception as a matter of *fact*. See id., 332–33. As to the petitioner, the lack of a "normal and healthy" parent-child relationship between the respondent and November began long before June, 2017, when the petitioner became involved in this matter. As the court found, Natachia G. prevented the respondent from having contact with November and hid the respondent's identity from November. It was not until May, 2018, following the petitioner's involvement in the case, that November learned that the respondent was her father. In his principal appellate brief, the respondent acknowledges Natachia G.'s role in preventing the initial development of any relationship between him and November, stating that "as a result of [Natachia G.'s] actions, [he] was unable to have any contact with November for approximately seven years, from 2011 until 2018," and that "[Natachia G.] . . . entirely prevented [him] from having any relationship with November for many years, despite his repeated efforts to develop such a relationship." In other words, the petitioner did not cause the lack of a "normal and healthy" parent-child relationship between the respondent and November.[13] Accordingly, the petitioner's conduct does not constitute "interference" for purposes of the interference exception. See *In re Tresin J.*, supra, 332 n.12.

In sum, the respondent's claim predicated on the interference exception fails.[14]

IV

The respondent's final claim is that the trial court improperly compared him with November's foster

mother in the adjudicatory part of its decision terminating his parental rights. We disagree.

We begin by setting forth the applicable standard of review and legal principles. To resolve the respondent's claim, we must construe the court's judgment. As set forth in part I of this opinion, this presents a question of law over which we exercise plenary review. See *In re Xavier H.*, supra, 201 Conn. App. 95.

"[A] judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. Our statutes and [case law] make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence. . . . [A] parent cannot be displaced because someone else could do a better job raising the child. . . . The court, however, is statutorily required to determine whether the parent has achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *In re Corey C.*, 198 Conn. App. 41, 80–81, 232 A.3d 1237, cert. denied, 335 Conn. 930, 236 A.3d 217 (2020).

In addressing the respondent's claim, both parties cite *In re James O.*, 322 Conn. 636, 142 A.3d 1147 (2016), in their respective briefs. As this court recently summarized, "[i]n *In re James O.*, in concluding that the respondent mother had failed to rehabilitate, [our Supreme] [C]ourt held that the trial court did not improperly compare the respondent parents with the foster parent of the children at issue. Id., 652–57. The trial court noted that the foster parent provided the children with 'an environment that is calm and understanding of the children's needs.' . . . Id., 653. Further, the court stated that, '[a]s both [children's] therapists have made clear, the children have needed a caregiver who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety.' . . . Id. The court went on to state that the foster mother provided the children with such an environment and that she embodied the requisite characteristics of a parent who could meet the child's needs. 'In contrast,' the court continued, '[the respondent mother] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and, therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma.' . . . Id., 653–54. In

reviewing this language, the Supreme Court determined that the trial court's comparison to the foster mother was not improper because it was made 'in light of what the children's therapists have testified are the specific needs of the children. . . . The court is basing the level of care needed not on what [the foster mother] is providing to the children, but on what the children's therapists have testified the children need from a caregiver.' . . . Id., 655. Further, '[i]mportantly, the court never opined that [the foster mother] could meet the children's needs or that [the foster mother] ought to be the person to meet their needs.' . . . Id. Therefore, our Supreme Court held that the trial court did not improperly compare the respondent mother with the foster mother. Id., 657." *In re Corey C.*, supra, 198 Conn. App. 81–82.

In the present case, the respondent takes issue with the following statements, which the court made in considering whether he had failed to sufficiently rehabilitate: "The evidence shows that stability has been missing in November's life. November has found stability in her foster home where her foster mother has cared for her and [her sister] since November 22, 2017, except for November's periods of hospitalization. [The] [f]oster mother visits with November at Eagle House one day per week. . . . Social worker [Amber] Orvis testified that November's foster mother redirects November and 'doesn't push her.' [Orvis] described [the] foster mother as affectionate and bonded with November . . . . Having found a relative degree of stability, November now needs permanence. [The] [f]oster mother has expressed that she wants to be a long term adoptive resource for November . . . ." The court also found that "November is in need of a safe and permanent home with a proven competent caretaker because neither biological parent is capable of providing such a home for her within a reasonable time."

We conclude that the court did not improperly compare November's foster mother with the respondent in determining that the respondent had failed to sufficiently rehabilitate. Immediately before making the challenged statements, the court observed that "[o]ur Supreme Court has repeatedly recognized that stability and permanence are necessary for a young child's healthy development. *In re Egypt E.*, 327 Conn. 506, 531, [175 A.3d 21, cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children & Families*, U.S. , 139 S. Ct. 88, 202 L. Ed. 2d 27] (2018)." (Internal quotation marks omitted.) Additionally, prior to making the challenged statements, the court reiterated that the respondent's rehabilitative status had to be viewed in relation to the age and needs of November and referenced "November's many psychological and emotional needs created by the trauma she has experienced . . . ." Viewed in context of the memorandum of decision as a whole, we construe the challenged statements as highlighting November's need for stability and per-

manence and the respondent's inability to provide the same to her within a reasonable time. Moreover, the court did not opine that only November's foster mother could meet November's needs or that the foster mother ought to be the person to meet those needs. Instead, the court expressly found that "November is in need of a safe and permanent home *with a proven competent caretaker* because neither biological parent is capable of providing such a home for her within a reasonable time." (Emphasis added.) Accordingly, we conclude that the court did not make an improper comparison between the respondent and November's foster mother in the adjudicatory part of its decision.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** December 31, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The trial court also rendered judgments terminating the parental rights of November's mother, Natachia G., as to November and another minor child of whom Marcus H. is not the biological father. Natachia G. has not appealed from the judgments terminating her parental rights as to either child, and, therefore, we refer in this opinion to Marcus H. as the respondent.

[2] On February 14, 2011, the respondent was arrested and charged with manslaughter in the second degree in violation of General Statutes § 53a-56, evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (a), and failure to register as a sex offender in violation of General Statutes § 54-251. On October 6, 2011, the respondent was convicted of all three counts.

[3] In the petition, the petitioner also sought to terminate the parental rights of Natachia G. as to November. Additionally, in a separate petition, the petitioner sought to terminate Natachia G.'s parental rights as to another child of whom the respondent is not the biological father. The judgments terminating the parental rights of Natachia G. as to November and the other child are not at issue in this appeal. See footnote 1 of this opinion.

[4] Patrick G.'s death was unrelated to the incident on June 24, 2017, when Natachia G. stabbed him.

[5] "Intensive In-Home Child and Adolescent Psychiatric Services, known also as IICAPS, provides home-based treatment to children, youth and families in their homes and communities." (Internal quotation marks omitted.) *In re Yolanda V.*, 195 Conn. App. 334, 339 n.7, 224 A.3d 182 (2020).

[6] The record reflects that the respondent's current incarceration also stems from a conviction for failure to register as a sex offender in violation of General Statutes § 54-251.

[7] The attorney for November has adopted the petitioner's appellate brief.

[8] The respondent also argues that the court's finding was clearly erroneous in light of the court's purported inconsistent determination that the petitioner had failed to prove a lack of an ongoing parent-child relationship under § 17a-112 (j) (3) (D). As discussed in part I of this opinion, this argument is unavailing.

[9] As the court summarized, during the supervised telephone call at issue, "[the respondent] told November that she needed to behave and listen to the adults at [her] school. [The respondent] asked November what she wanted to be when she grows up and she said she wanted to be a teacher. [The respondent] told November she needed to know how to calm herself down if she wanted to be a teacher so she could help students if they are having difficulty." (Internal quotation marks omitted.)

[10] In his principal appellate brief, the respondent limits his claim to the contention that the court committed clear error in finding that he would be required to provide housing and financial support to November following his term of incarceration when, he argues, there was no evidence in the record reflecting that November would no longer be residing at Eagle House

at that time. His principal appellate brief contains only a cursory assertion that, assuming that he would be required to provide housing and financial support to November after his release from prison, the court also erred in finding that he would need time to secure housing and employment. In his reply brief, the respondent further propounds this claim, arguing that his future prospects for employment are contingent on a number of variable economic factors and that the evidence reflects that he made efforts to advance his education while incarcerated, which leads to a reasonable inference that he will be well positioned to obtain housing and employment once he leaves prison. We decline to address this claim, however, because "we consider an argument inadequately briefed when it is delineated only in the reply brief." *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010).

[11] In the cases cited by the respondent in his appellate briefs, our appellate courts discussed the interference exception in the context of the no ongoing parent-child relationship ground for termination of parental rights. See *In re Jacob W.*, supra, 330 Conn. 762–64; *In re Valerie D.*, 223 Conn. 492, 526–35, 613 A.2d 748 (1992); *In re Carla C.*, 167 Conn. App. 248, 272–80, 143 A.3d 677 (2016).

[12] In his reply brief, the respondent clarifies that he is not "contend[ing] that the interference exception applies to all cases where the petitioner claims that a parent has failed to rehabilitate pursuant to . . . § 17a-112 (j). Rather, [he is] contend[ing] that the interference exception applies only in cases where the trial court finds that the [parent] has failed to rehabilitate because he has failed to maintain a 'normal and healthy parent-child relationship.' " (Emphasis omitted.) We decline to discuss whether the interference exception is applicable, in some or all circumstances, to § 17a-112 (j) (3) (B) (i) because, as we subsequently conclude in this opinion, the interference exception is otherwise inapplicable under the facts of this case.

[13] In its memorandum of decision, the court expressly found that Natachia G., not the petitioner, interfered with the respondent's attempts to visit and to contact November. The respondent claims that the court's finding that the petitioner's conduct did not constitute interference was clearly erroneous. Because we conclude that the petitioner's conduct cannot trigger the interference exception under the facts of this case, we need not address the respondent's claim further.

[14] Although we conclude that even if the interference exception were adopted for purposes of the failure to rehabilitate ground, the exception would not be satisfied as a matter of fact in this case, we note that § 17a-112 (k) requires a trial court, in determining whether termination of parental rights is in the child's best interest, to consider, among other factors, "the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent." General Statutes § 17a-112 (k) (7). In determining that terminating the respondent's parental rights was in November's best interest, the court found that there was substantial evidence that Natachia G. prevented the respondent from maintaining a meaningful relationship with November.